1
2
3
4
5
6
7

8        UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA

10        SAN JOSE DIVISION

11

12   ALLEN JOE JOHNSON,                     Case No. 5:13-CV-03967-RMW

13             Plaintiff/Claimant,          **ORDER DENYING PLAINTIFF'S
                                            MOTION FOR SUMMARY
14        v.                                JUDGMENT AND GRANTING
                                            DEFENDANT'S CROSS-MOTION FOR
15    CAROLYN COLVIN, Acting Commissioner,  SUMMARY JUDGMENT**
     Social Security Administration,
16
                                            [Re: Docket No. 15, 17]
17             Defendant.

18

19                              **I.   INTRODUCTION**

20        Plaintiff Allen Joe Johnson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for

21   review of the final decision by Carolyn Colvin, the Acting Commissioner of the Social Security

22   Administration ("Commissioner"), denying plaintiff's claims for disability benefits under the Social

23   Security Act. Plaintiff moves for summary judgment and requests that the court reverse the

24   Commissioner's decision and grant benefits. Motion for Summary Judgment ("MSJ"), Dkt. No. 15.

25   In the alternative, plaintiff requests remand for a new hearing. *Id.* Commissioner opposes plaintiff's

26   motion for summary judgment and requests that this court affirm Commissioner's decision. Dkt.

27   No. 17. For the reasons set forth below, the court DENIES plaintiff's motion for summary judgment

28   and affirms Commissioner's decision.

*United States District Court*
*For the Northern District of California*

## II.  BACKGROUND

### A.  Procedural History

Plaintiff applied for Supplemental Security Income ("SSI") benefits under Title XVI on July 2, 2009. Dkt. No. 12, Transcript of Administrative Record ("AR"), at 272. Plaintiff's claim was denied both initially and upon reconsideration. AR 211-215, 217-221. Plaintiff requested a de novo hearing before an administrative law judge (ALJ) and on August 29, 2011 a hearing was held before ALJ Teresa L. Hoskins Hart. AR 100-128. At the hearing, ALJ Hart found that plaintiff was not disabled. AR 181-196. Plaintiff appealed the ALJ's decision to the Appeals Council. AR 18. Additional argument was submitted, and the Appeals Council vacated the ALJ's initial decision and remanded the matter to the ALJ with instructions to clarify whether plaintiff understood the consequences of amending his alleged onset date and withdrawing his Title II request for hearing. AR 202. The Appeals Council also requested that the ALJ provide detailed and itemized mental limitations and a rationale with specific references to evidence of record in support of the residual functional capacity (RFC) determination. AR 200-205.

The ALJ held a second hearing on November 1, 2012. AR 129-176. On February 1, 2013 the ALJ issued a second decision, again rejecting plaintiff's claim. AR 20-41. After the Appeals Council denied review, the ALJ's February 1, 2013 decision became the final decision of the Commissioner and the subject of this appeal. AR 1-6.

### B.  Plaintiff's Medical History

Plaintiff alleges disability starting July 1, 2009[1] due to manic depression and bipolar disorder. AR 283. He alleges that his ability to work is limited because he has "manic depression" and "bipolar disorder" and he is "tired all the time" and does "not have the ambition to do anything." AR 283.

Plaintiff has been diagnosed with both mood disorder not otherwise specified ("NOS"),[2] bipolar disorder type II,[3] and polysubstance dependence, in remission.[4] He was treated by

---

[1] Plaintiff initially alleged the onset of disability was March 31, 2004, but later amended it to July 1, 2009. AR 23, 283.

[2] *See* AR 474 (March 19, 2009, mood disorder NOS and polysubstance abuse, GAF 65); AR 476 (April 14, 2009, mood disorder resolved); AR 487, 568, 581 (MFT Hsiang, October 6, 2009 and

United States District Court
For the Northern District of California

1  psychiatrist Dr. Susan Harris from April 16, 2010 to October 5, 2012, and received counseling

2  treatment from Sylvia Hsiang, MFT (Marriage & Family Therapist) from October 6, 2009 to August

3  31, 2010. AR 484, 487, 606, 652. Plaintiff was also assessed by Dr. Maria Acenas on August 21,

4  2009, and by Dr. Jan Weber on December 14, 2009, January 4, 2010 and February 1, 2010. AR 395,

5  516, 532-34, 539. Additionally, plaintiff received several initial mental health intake evaluations in

6  connection with his incarcerations between 2006 and 2009, and sought treatment on March 1, 2009,

7  during his last incarceration period. AR 26, 473-474, 424-483. Dr. Aguilera saw plaintiff for several

8  visits in 1996 and once more in 2014 for an evaluation report. AR 419-423.

9       **1.  Dr. Susan Harris M.D., Psychiatrist**

10       **a.  Mental Health Professional Questionnaires**

11       Plaintiff began seeing Dr. Harris on April 16, 2010. AR 590. After thirteen visits, Dr. Harris

12  completed a mental health professional questionnaire on August 12, 2011, in which she diagnosed

13  plaintiff with bipolar disorder type II. AR 590. Dr. Harris explained that she based her diagnosis on

14  the following symptoms: bland mood reported on May 7 and 28, 2010; irritability and increased

15  mood swings reported on July 22, 2011; fairly consistent apathy and lack of interest in social

16  activities; weight loss of 11 pounds in four months with some nausea;[5] problems falling asleep

17  reported on March 6, 2011; plaintiff not following through on his plans due to lack of energy; some

18  earlier difficulty with poor focus; blunt, flat, or inappropriate effect from April to June 2010, prior

19  to medication changes; a pattern of social isolation, sometimes irritability that makes him not want

20  

21  November 20, 2009, mood disorder NOS); AR 534 (Dr. Weber, December 14, 2009 mood disorder
NOS, and polysubstance dependence in remission, GAF 45); AR 508-09 (February 22, 2010 mood

22  disorder NOS, GAF 57); AR 486 (MFT Hsiang, August 31, 2010 discharge diagnoses mood
disorder NOS, GAF 67).
[3] *See* AR 423 (Dr. Aguilera, September 6, 2004, bipolar disorder NOS); AR 516 (Dr. Weber,

23  February 1, 2010, bipolar II disorder and polysubstance dependence, in remission); AR 590 (Dr.
Harris, April 16, 2010 to October 5, 2012, bipolar disorder type II).

24  [4] *See* AR 396 (Dr. Acenas, August 21, 2009 polysubstance dependence in remission only, GAF 70 );
AR 534 (Dr. Weber, January 6, 2010 mood disorder NOS and polysubstance dependence in

25  remission, GAF 45); AR 516 (Dr. Weber, February 1, 2010, bipolar II disorder and polysubstance
dependence, in remission). Bipolar disorders are illnesses that affect one's thoughts, feelings,

26  perceptions, and behavior, and a person with bipolar disorder experiences moods that shift from
high to low and back again with varying degrees of severity. It is not clear from the record whether

27  plaintiff meets the standard for bipolar II disorder under the DSM-V.
[5] However, Dr. Harris also mentions that plaintiff was able to cook and eat healthier after getting his

28  own apartment. AR 591.

United States District Court
For the Northern District of California

to be around others; and lack of socialization when depressed. AR 590-593. Dr. Harris assigned some of plaintiff's passivity and isolation to his family history and some to his bipolar disorder, and recommended increased socialization through day programs for future treatment, mentioning that a partial remission of the symptoms would be a "best case prognosis." AR 593. Using a rating scale of mild, moderate, marked, and extreme,[6] the highest limitation rating identified by Dr. Harris was a moderate limitation as to plaintiff's ability to understand and remember detailed instructions, ability to carry out such instructions, and ability to maintain attention and concentration for extended periods, citing issues in focus and irritable thoughts one third of the time. AR 593-594. She also rated as moderate plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, as well as his ability to sustain an ordinary routine without special supervision, ability to complete a normal work day and workweek without interruption from symptoms, and ability to perform at a consistent rate without additional rest periods, because of periods of low energy and social withdrawal that "would likely impair [plaintiff] 1/3 of the time." AR 594-595. Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors was rated as moderate based on plaintiff's family history with an abusive father, and his difficulties in maintaining persistence were rated as moderate due to a pattern of not pursuing his plans.[7] AR 595, 597. Dr. Harris rated as mild plaintiff's ability to remember locations and work-like procedures, ability to work in coordination and proximity to others without being distracted, ability to make simple work-related decisions, ability to interact appropriately with general public, ability to ask simple questions or request assistance, ability to respond to changes in the work setting, ability to set realistic goals or make plans independently of others, and his restriction on activities of daily living. AR 593-597.

On a follow-up questionnaire dated October 24, 2012, Dr. Harris noted that on account of the moderate limitations to his ability to perform activities within a schedule, maintain regular

[6] Dr. Harris was asked to define *moderate* as a significant limitation on work-related activities that would cause interference about 1/3 of the time, *marked* as severe limitation with interference 2/3 of the time, and *extreme* as an inability to perform the activity. AR 593.
[7] Dr. Harris gives as an example plaintiff's talking about taking a computer class for one year but not doing so.

United States District Court
For the Northern District of California

1    attendance, and be punctual within customary tolerances, plaintiff was likely to be absent from work

2    more than four days per month. AR 670. Regarding her assessment of moderate limitations in

3    maintaining attention and concentration for extended periods, Dr. Harris added that plaintiff's

4    symptoms would frequently interfere with the attention and concentration necessary to sustain

5    simple repetitive work tasks. AR 670. Regarding her determination of moderate limitation in

6    performing consistently, Dr. Harris noted she did not think plaintiff could work eight hours a day

7    and that he would need at minimum two breaks per every four hours in addition to the typical three

8    breaks during an eight hour work day. AR 671.  She also qualified her previous determination of

9    moderate limitations in plaintiff's ability to accept instructions from supervisors and respond

10   appropriately to criticism in the workplace, stating that "he may overreact to instructions and

11   misinterpret them as criticism," and he "may feel criticized and withdraw, being unable to work

12   because of severe depression." AR 671.

### b.  Medical Services Progress Notes

14         At the initial assessment plaintiff was diagnosed with bipolar disorder type II and

15   amphetamine dependence in remission, having been off drugs for fourteen months. AR 652-54.

16   Plaintiff was also assessed as being obese. AR 652-54. He was not on any medication; he was alert,

17   calm, coherent, and rational, with low mood and affect constricted, but with fairly good insight and

18   judgment, and no safety issues. AR 652-54. Dr. Harris started him on Trileptal and Wellbutrin for

19   depression and as mood stabilizers. AR 652-54. Plaintiff visited Dr. Harris once a month until the

20   end of 2010, then once every two months until July 2011, when he went back to the once a month

21   schedule until June 2012. AR 630-54. After June 2012, plaintiff had only two more appointments, in

22   September and October 2012. From May 2010, plaintiff's mood and affect improved steadily until

23   at least July 2011. Plaintiff's mood is reported as bland for the two May 2010 visits, but for the

24   following nine visits Dr. Harris reported euthymic mood, less irritability, brighter, more positive

25   affect, more energy and optimism, and that plaintiff was stable while on his medication. AR 640-51.

26   Dr. Harris also reported that plaintiff was doing well in the face of problems with housing, as he

27   living in a shelter and at the same time had to complete 140 hours of community work and a court-

28

1    ordered program as result of his last incarceration. *Id*. Dr. Harris reported that plaintiff was off

2    drugs, subsequently reaching a two year mark in Mach 2011, and that he was compliant with a

3    court-ordered program, from which he graduated from in July 2010. Dr. Harris also noted that

4    plaintiff was working on finding an apartment to live on his own, which he obtained in October

5    2010, and that he was working on losing weight, losing 2-3 pounds monthly, at a steady rate, until

6    he reached a healthy weight in April 2012. AR 634, 638, 642, 644, 647.

7        Until January 2011, plaintiff's medication was the same and his compliance was good. AR

8    643-654. During this period, the progress notes state that he was more selective in making friends,

9    that he was negotiating problems with less passivity, that he wanted to go back to school and saw

10   himself as fairly expert and confident with computers, but lacking credentials. AR 643-654. He was

11   doing well despite delays and problems with housing and benefits, his sleep was much better, he

12   was looking into getting a job at a warehouse with the help on one of his friends, he enjoyed a quiet

13   life in his apartment, and he regularly saw a friend who used his kitchen to make a cheese spread

14   they planned on selling at a farmer's market. AR 643-654.

15       In January 2011, Dr. Harris made some changes to plaintiff's medication, reducing his

16   dosage of Trileptal and starting him on Lithium because of his low platelet count. AR 643. Plaintiff

17   went off his medication for about three weeks in March 2011 and reported some nausea in the

18   morning as a result of the Lithium medication, so Dr. Harris prescribed a different variant. AR 641-

19   42. Nonetheless, Plaintiff's mood continued to be euthymic, he felt energetic and less like using

20   methamphetamines, and he reported less, but more consistent, sleep. AR 641-42. Plaintiff reported

21   he wanted to find work online using Craigslist.org. AR 641. Dr. Harris requested that plaintiff get

22   labs drawn, but plaintiff missed his appointment, and the record indicates that the labs were not

23   received until November 2011. AR 642, 638.

24       Dr. Harris's notes between July 2011 and February 2012 report plaintiff's mood as euthymic

25   and his affect as appropriate, but that his irritability increased and his mood swings returned after he

26   was taken off Trileptal. AR 636-40. Nonetheless, plaintiff reported studying books to prepare to go

27

28

1    back to school to get an A+ certification for computer repair, he continued to lose weight, was more

2    active as a result of the weight loss, and went hiking with friends. AR 639, 640.

3         In November 2011, plaintiff ran out of his medication, and had various issues with obtaining

4    or taking the medication until approximately June 2012.  AR 633-638. Starting November 2011, the

5    progress notes report that plaintiff again felt irritable and was isolating, but that his mood was

6    euthymic and affect appropriate, he was motivated by his weight loss and interested in getting into a

7    work-out discipline to reduce irritability, and that he had made cookies from a special recipe he

8    found online for his visit to a friend for Christmas. AR 637-38. Plaintiff also mentioned that he had

9    issues remembering to take his medication after he was reinstated on it, but that he was getting more

10   consistent even though he was not able to take it daily. AR 636.

11        In February 2012, plaintiff reported feeling frustrated and disappointed because of the denial

12   of his request for SSI and not having heard from his attorney. AR 636. His mood was assessed as

13   low and his affect constricted, speech and movements slowed, and that he was depressed. AR 636.

14   But from March to September 2012 his mood became brighter and euthymic, and after hearing from

15   his attorney, he was less depressed and more animated. AR 633-35. In March plaintiff was still

16   reported to be off his medication, but supposed to get back on it. AR 635. By April 2012, plaintiff

17   reached a healthy weight and set a new goal of 195 pounds, he reported his self-esteem was

18   improving, he was sleeping better, and he was talking more to his upstairs neighbor that he liked,

19   and who offered to pick him up and drive him home after a minor surgery scheduled for May of that

20   year. AR 634.

21        Dr. Harris ordered new labs drawn in April 2012, but they were postponed until October 12,

22   2012. AR 678.

23        Plaintiff's mood was described as stable and euthymic with affect appropriate from May

24   2012 to September 2012. AR 631-33. During this period, Dr. Harris reported that plaintiff had an

25   "unusual" outburst where he broke his keyboard in frustration with the lag of his computer, and

26   mentioned that while she thought his Lithium levels needed to be increased, she did not want to do

27   so before getting new lab results. AR 632.

28

1    Starting September 2012, Dr. Harris reduced plaintiff's dosage of Wellbutrin, increased his

2    Lithium, and prescribed Zyprexa. AR 631. The last two progress notes, from September and

3    October 2012, report animated mood, affect with increased intensity, more rapid or restless

4    movements, and hyperactivity. AR 630-31.

5    Throughout the entire treatment period, all of Dr. Harris's notes describe plaintiff as alert,

6    neatly or casually dressed, with coherent and rational thoughts, good insight and judgment, and no

7    safety issues. AR 630-654.

8    **2.  Dr. Maria Antoinette D. Acenas M.D., Psychiatrist**

9    Dr. Acenas performed a psychiatric evaluation of plaintiff on August 21, 2009. AR 395. She

10   diagnosed plaintiff with only polysubstance dependence in recent remission, and assigned him a

11   Global Assessment of Functioning ("GAF") score of 70.[8] AR 396. Dr. Acenas determined that

12   plaintiff's mood was mildly depressed with appropriate affect, his speech was spontaneous, and he

13

14   [8] The GAF Scale: 91-100: "Superior functioning in a wide range of activities, life's problems never
     seem to get out of hand, is sought out by others because of his or her many positive qualities. No

15   symptoms." 81-90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good
     functioning in all areas, interested and involved in a wide range of activities, socially effective,

16   generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional
     argument with family members)." 71-80: "If symptoms are present, they are transient and

17   expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument),
     no more than slight impairment in social, occupational, or school functioning (e.g., temporarily

18   falling behind in schoolwork)." 61-70: "Some mild symptoms (e.g., depressed mood and mild
     insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy

19   or theft within household), but generally functioning pretty well, has some meaningful interpersonal
     relationships." 51-60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional

20   panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends,
     conflicts with peers or co-workers)." 41-50: "Serious symptoms (e.g., suicidal ideation, severe

21   obsessional ritual, frequent shoplifting) or any serious impairment in social, occupational, or school
     functioning (e.g., no friends, unable to keep a job)." 31-40: Some impairment in reality testing or

22   communication (e.g., speech is sometimes illogical, obscure, or irrelevant) or major impairment in
     several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed

23   man avoids friends, neglects family, and is unable to work; child frequently beats up younger
     children, is defiant at home, and is failing at school)." 21-30: "Behavior is considerably influenced

24   by delusions or hallucinations or serious impairment in communication or judgment (e.g.,
     sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function

25   in almost all areas (e.g., stays in bed all day; no job, home, or friends)." 11-20: "Some danger of
     hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent;

26   manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or
     gross impairment in communication (e.g., largely incoherent or mute)." 1-10: "Persistent danger of

27   severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal
     personal hygiene or serious suicidal act with clear expectation of death." *Diagnostic and Statistical*

28   *Manual of Mental Disorders*, at 34 (4th ed. text rev. 2000).

1   was friendly and cooperative. AR 396. Additionally, Dr. Acenas observed that plaintiff was

2   receiving appropriate psychiatric treatment, but thought the likelihood of recovery was "guarded

3   due to high risk of relapsing." AR 396.

4       Dr. Acenas's functional assessment described plaintiff as capable of managing funds, having

5   basic mathematical skills and the ability to perform simple and repetitive tasks. In Dr. Acenas's

6   opinion, plaintiff would be able to accept instructions from supervisors, perform work activities on a

7   consistent basis, maintain regular attendance in the workplace and complete a normal work week,

8   and that he would be able to deal with the usual stress encountered in a work environment. AR 396.

9   ### 3.  Dr. Jan Weber M.D., Psychiatrist

10       Dr. Weber first met plaintiff on December 14, 2009[9] and diagnosed him with mood disorder

11   NOS and polysubstance dependence in remission, with bipolar disorder and major depressive

12   disorder to be ruled out. AR 534. At this visit, Dr. Weber noted that plaintiff did not meet the

13   bipolar criteria, but because plaintiff was not able to provide much information, she asked to speak

14   to his mother during the following visit. AR 533. Dr. Weber assigned plaintiff a GAF score of 45.

15   AR 534.

16       After the second visit, on January 4, 2010, Dr. Weber found plaintiff was still depressed and

17   she spoke over the phone with plaintiff's mother. AR 539. Dr. Weber determined that plaintiff

18   appeared to meet "the criteria for bipolar II disorder, even though information is still a bit limited

19   and client has a longstanding [history] of meth abuse."

20       Plaintiff saw Dr. Weber once more, on February 1, 2010. AR 516. Dr. Weber observed that

21   plaintiff was stable and that his mood was "o.k. for the most part," as was his sleep. AR 516. Dr.

22   Weber reported that his appetite was normal and energy average. AR 516. Dr. Weber kept her

23   assessment of bipolar II disorder and polysubstance dependence in remission. AR 516.

24

25

26

27   _____

[9] Progress note was dated January 6, 2010 because of problems with the software used for data entry, but Dr. Weber made note of the fact that the visit was actually on December 14, 2009. AR 534.

28

Case No. 5:13-CV-03967-RMW          - 9 -

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
EDB

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

On all three visits with Dr. Weber, plaintiff mentioned that he was likely to transfer to a different mental health program and asked Dr. Weber to hold off on prescribing any medication until he did so.

### 4. Sylvia Hsiang, Licensed Marriage and Family Therapist

Plaintiff started working with Ms. Hsiang as part of his probation and court-ordered program, on October 6, 2009. AR 491. Plaintiff completed the program in July 2010 and was discharged on August 31, 2010. AR 485. In October 2009, Ms. Hsiang diagnosed plaintiff with mood disorder NOS and assigned him a GAF score of 57. AR 487. In December 2009, Ms. Hsiang noted that at the time of the initial contact, plaintiff's mood was depressed and irritable. AR 491. Plaintiff expressed his goal of monitoring his mood and thought patterns in order to "live a normal, functional life," and remain sober and clean as long as possible, setting one year goals at a time. AR 491. Ms. Hsiang notes that plaintiff participated consistently in group sessions, eight times per week. AR 491.

At time of discharge, in August 2010, plaintiff's diagnosis was still mood disorder NOS, but his GAF score was 67. AR 486.

### 5. David M. Aguilera Ph.D., Psychologist

Dr. Aguilera saw plaintiff for several visits in 1996 and then once for an evaluation report in 2004. AR 423. In 2004, Dr. Aguilera diagnosed plaintiff with bipolar disorder NOS and assigned him a GAF score of 35. AR 423. He observed that plaintiff was dependent upon his mother to arrange and ensure he kept his appointments. AR 419. He also noted that plaintiff missed an important appointment to resolve a traffic ticket, which resulted in a much higher penalty. AR 419. Plaintiff felt like appearance was unimportant and usually did not shave his beard. AR 419, 421.

Most of Dr. Aguilera's notes are based on reports by plaintiff and his mother. Dr. Aguilera reported that plaintiff "can be pleasant and cooperative, but can suddenly become tense and hostile if he feels others are picking on him." Plaintiff reported that he was forgetful when he was very depressed, and that he would spend three to four days of the week in bed, getting up only to eat and use the bathroom, and would forget the day of the week. AR 420-21. He would also sometimes stay

up three or four days at a time. AR 421. Plaintiff appeared suspicions of people, thinking they were hostile, and he reacted with angry behavior. AR 421. At that point in time, plaintiff's roommate would do all the shopping, cleaning, and cooking, and would also manage plaintiff's money allowance from his mother. AR 421.

Plaintiff is reported to have worked five months at McDonald's, some time at a bike shop, and most recently for two years cleaning chimneys until he quit in 2002. AR 422. Plaintiff reported being late to work at least every other day, not taking initiative to complete routine or special tasks, quitting easily, not being able to work with peers or other people generally, and always feeling like other people made more money for less work which made him "slack off." AR 422. Plaintiff was not taking any prescribed medication, but was using marijuana in an attempt to control his moods on his own. AR 420, 423.

### 6.  Ms. Della Savage, Social Worker

Ms. Della Savage was plaintiff's supportive housing case manager from July 2010 to September 2012. AR 371.  She described plaintiff as isolated, socially withdrawn, suffering from anxiety, and as having severe irritability. AR 371.  Ms. Savage reported that she interacted with plaintiff once a week or twice a month, and that often when visiting plaintiff at his apartment she found him sitting in the dark, not doing anything all day. AR 371. She also noted that plaintiff suffered from anhedonia (an inability to experience pleasure) and had no real outside interest or hobbies. AR 371. According to Ms. Savage, plaintiff had "bad spells" when he did not shower, eat, or leave his apartment for extended periods of time, and mentioned that during one of these periods that lasted a few weeks, plaintiff lost thirty pounds. AR 372. Ms. Savage also stated that plaintiff "has no relationship with his family members, and does not connect in any meaningful way to his neighbors." AR 372. Moreover, she asserted that plaintiff had difficulty concentrating and maintaining social functioning for more than thirty minutes, had an incredibly difficult time communicating with others, became irritable very quickly, and had difficulty coping with certain unexpected triggers. AR 372. Ms. Savage thinks plaintiff would not be able to keep a normal schedule due to his inability to maintain a normal routine and sleep schedule. AR 372. In the two

1  years she interacted with him, Ms. Savage states that plaintiff's status did not improved at all and he

2  remained stagnant and unable to make any progress towards his goals. AR 372.

3          Ms. Savage also filled out a mental residual functioning capacity questionnaire in July 2011,

4  wherein she states that she helped plaintiff obtain mental health appointments and medication, paid

5  his rent, and served as a contact person between plaintiff and his property manager. AR 357. She

6  also provided him with budgeting skills and skills to maintain his home safe and clean, and provided

7  other support as needed. *Id*. She also noted that plaintiff had difficulties staying asleep, did not

8  exercise or walk outside, and had paranoid thoughts and anxiety that "kept him from simple

9  leisurely things like attending a movie." AR 357-59.

### 7.   Ms. Daisy Patino, Social Worker

11         Ms. Patino became plaintiff's case manager after Ms. Savage, and provided her insight on

12  October 11, 2012, after having worked with plaintiff for one and a half months and meeting him

13  three times, twice at home.  AR 368. Ms. Patino noted that she found plaintiff isolated, sitting in the

14  dark in his apartment, without doing anything. AR 368. According to Ms. Patino, plaintiff was

15  unable to follow through with his goals, had trouble sitting still, and exhibited anxious and agitated

16  behavior, which led him to obsessively clean his apartment or incessantly scratch himself. AR 368.

17  She also mentioned that even though plaintiff spoke occasionally with his upstairs neighbor, he did

18  not have any meaningful personal relationships. AR 368.

### C.  Plaintiff's Age, Educational, and Vocational History

20         Plaintiff was born on December 10, 1979 and he is 35 years old. He completed the 11th

21  grade and has earned a G.E.D. AR 138. In the fifteen years prior to the onset of disability[10], he

22  worked as a cashier, as a chimney sweep, and at a bike shop. TR 162-163. He has not worked since

23  2002. AR 382.

---

[10] For the claim at issue here, plaintiff's alleged disability onset date is July 1, 2009. TR 133.

**United States District Court**
For the Northern District of California

**D.  The ALJ's Findings and Analysis**

Plaintiff alleged that he has bipolar disorder and manic depression and has had these conditions since at least 2004. AR 283. He alleged being tired all the time and not having the ambition to do anything. AR 283.

The ALJ addressed whether plaintiff was disabled under section 1614(a)(3)(A) of the Social Security Act, applying the five-step sequential evaluation process established by the Social Security Administration for determining whether a plaintiff is disabled. *See* 20 C.F.R. § 416.920(a).[11] At step one, the ALJ determined that plaintiff had "not engaged in substantial gainful activity since July 1, 2009, the alleged onset date." AR 26.

At step two, the ALJ determined that plaintiff suffered from two severe impairments: mood disorder NOS, and history of polysubstance abuse. AR 26. The ALJ reached this conclusion after noting that plaintiff had been diagnosed as such multiple times. AR 26-27.  Dr. Harris diagnosed

---

[11] Pursuant to 20 C.F.R. § 416.920(a), the Social Security Administration follows a five-step sequential inquiry for determining whether an individual is disabled. At each step, a determination that claimant is disabled or not disabled is conclusive and will prevent the ALJ from moving to the next step. *Id.* During the first four steps, the burden is on plaintiff to show he or she is disabled. *See Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989). At step one, the ALJ considers whether the claimant has engaged in substantial gainful activity ("SGA") during the time in question. 20 C.F.R. §§ 416.920(a)(4)(i), 416.972(a) and (b). If plaintiff has not engaged in SGA, the ALJ proceeds to the second step and determines if plaintiff has a severe medically determinable physical or mental impairment that has lasted or is expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 416.920(a)(4)(ii) and (c), 416.909. If plaintiff does not have a severe medically determinable physical or mental impairment that meets the duration requirement, the ALJ will find claimant not disabled. *Id.* If he does, the ALJ will proceed to the next step. At step three, the ALJ determines if plaintiff's impairment equals or exceeds one of the impairments listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. §§ 416.920(a)(4)(iii) and (d), 416.925, 416.926. If plaintiff's disability does equal or exceed the listed impairments, then plaintiff is concluded to be disabled. 20 C.F.R. § 404.920(a)(4)(iii). Otherwise, the ALJ proceeds to step four, where the ALJ must determine plaintiff's residual functional capacity ("RFC"), taking in consideration all of claimant's impairments, severe and non-severe, and determine if the claimant can meet the requirements of his or her past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), (f), and (h), 416.960(b). If claimant can still do past relevant work, he or she is not disabled. If plaintiff is unable to return to previous types of employment, the analysis proceeds to the fifth and last step, and the ALJ must determine whether the claimant is able to do any other work, considering claimant's RFC, age, education and work experience. 20 C.F.R. §§ 416.920(a)(4)(v), (g), and (h), 416.960(c). In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that other work that claimant can do, exists in significant numbers in the national economy. 20 C.F.R. §§ 416.912(f).

1   plaintiff with bipolar disorder type II, but the ALJ noted that Dr. Harris's treatment reports indicate

2   that plaintiff's objective mental status was generally normal and stable, with few deviations. AR 30.

3   Going through plaintiff's treatment history with Dr. Harris from April 2010 to October 2012, the

4   ALJ points to the many treatment notes which indicate that plaintiff was improving: plaintiff was

5   feeling less like using methamphetamines, celebrating the one and two-year marks of not abusing

6   drugs; he was interested in finding work online as a delivery truck driver; he graduated from court-

7   ordered program without issues, completing 140[12] hours of community service; he found an

8   apartment to live in on his own; he became interested in pursuing computer classes, studying books,

9   and preparing to go back to school to get an AA degree in systems administration; and  he steadily

10  lost weight, eventually reaching his goal and a healthy BMI. AR 27-30. The ALJ also noted that

11  during treatment, Dr. Harris adjusted plaintiff's medication a few times, and the ALJ made note of

12  many medical non-compliance periods, both voluntary and non-voluntary, between August 2011

13  and October 2012.

14        At step three, the ALJ determined that plaintiff did "not have an impairment or combination

15  of impairments that meets or medically equals the severity of one of the listed impairments in 20

16  C.F.R. Part 404, Subpart P, Appendix 1." AR 31.  In making this finding, the ALJ considered

17  whether the "paragraph B" criteria[13] were satisfied, and whether there was evidence of inability to

18  function as contemplated by the paragraph C criteria for section 12.04. AR 31, 32. The ALJ found

19  that plaintiff had mild restrictions on activities of daily living, as he was able to live independently

20  in his own apartment, do his own laundry, handle bank accounts, use public transit, attend medical

21  appointments and pursue his interests in computers. AR 31.

22

23  _____

    [12] ALJ's findings say 1,400 hours, but this is a typo. *See* AR 648.

24  [13] The criteria in paragraphs B and C describe impairment-related functional limitations that are
    incompatible with the ability to do any gainful activity. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. To

25  satisfy the paragraph B criteria, the mental impairments must result in at least two of the following
    four: marked restrictions in activities of daily living; marked difficulties in maintaining social

26  functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated
    episodes of decompensation, each of extended duration. *Id.* The "marked" as a standard for

27  measuring the degree of limitation, means more than moderate but less than extreme. *Id.* The term
    repeated episodes of decompensation, each of extended duration means three episodes within 1

28  year, or an average of once every 4 months, each lasting for at least 2 weeks. *Id.*

United States District Court
For the Northern District of California

1    The ALJ found moderate limitations on plaintiff's social functioning, as plaintiff was able to

2    maintain several friendships, including with his friend from the shelter who used his kitchen, his

3    neighbor who gave him a ride from surgery, his hiking friends, and the friend he visited for the

4    holidays and for whom he baked cookies. AR 31. Moreover, Plaintiff had also testified that he met

5    friends for dinner and a movie three-four times a month and that he invited his mother to visit him.

6    AR 31.

7    The ALJ found that plaintiff had mild limitations with concentration, persistence, or pace.

8    AR 31. Plaintiff considered computers his strength and was reading on the subject in preparation for

9    going back to school, he was able to navigate the internet in search of a job and for cookie recipes,

10   and he was able to make cookies from a special recipe. *Id*. Although plaintiff seemed to have

11   trouble having his labs drawn and remembering his medications, he was able to keep his apartment,

12   make his medical appointments, complete forms for student loan deferment, obtain speakers for his

13   computer to assist with his sleep hygiene, and other various activities that interested or motivated

14   him. AR 31.

15   Finally, the ALJ found no evidence of any episodes of decompensation. AR 32.

16   At step four, the ALJ determined that plaintiff had the residual functional capacity ("RFC")

17   to perform a full range of work at all exertional levels, but with certain non-exertional limitations.

18   AR 32. The ALJ found that plaintiff was "able to perform simple repetitive tasks of unskilled work

19   where interpersonal contact with the general public is no more than routine, superficial and

20   occasional." AR 32. The ALJ also found that plaintiff had no past relevant work, so transferability

21   of job skills was not an issue. AR 36.

22   The ALJ's analysis followed a two-step process. AR 32. First, she determined whether there

23   was an underlying medically determinable physical or mental impairment[14] that could reasonably be

24   expected to produce plaintiff's pain or other symptoms. At the second step, the ALJ evaluated the

25   intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which

26   they limit plaintiff's functioning. AR 32. The ALJ based her RFC finding upon the "ongoing and

27   _____

[14] A "medically determinable physical or mental impairment" is an impairment that can be shown

28   by medically acceptable clinical and laboratory diagnostic techniques.

United States District Court
For the Northern District of California

1  essentially benign mental status evaluations submitted by [plaintiff's] long-time psychiatrist, Dr.

2  Harris." AR 32. The ALJ found that two of Dr. Harris's mental status evaluations were inconsistent

3  with the rest, as well as with the evidence of plaintiff's daily living activities, so the ALJ gave these

4  inconsistent evaluations less than controlling weight. AR 32. First, the ALJ accorded less than

5  controlling weight to Dr. Harris's August 12, 2011 assessment, in which Dr. Harris opined that

6  plaintiff's limitations were mostly mild, or none, and no greater than moderate in a few aspects. AR

7  32. She did so because the moderate findings in the August 12, 2011 evaluation were "inconsistent

8  with the ongoing and benign mental status evaluations documented by this same treating physician,

9  even during periods of medical non-compliance with prescribed medications as well as his

10  inconsistent activities of daily living that do not support greater restriction." AR 32. Second, the

11  ALJ rejected Dr. Harris's October 24, 2012 questionnaire as conclusory and non-durational, in

12  addition to being inconsistent with the other probative opinions, plaintiff's limited psychological

13  treatment and compliance, and plaintiff's daily living activities. AR 32–33.

14       The ALJ found that the letters provided by lay witnesses Della Savage and Daisy Patina

15  appeared to simply parrot plaintiff's subjective complaints, and that their reports of severe

16  depression, lack of sleep, seclusion, isolation, and lack of social functioning levels were

17  contradicted by Dr. Harris's ongoing treatment notes, which documented plaintiff's good sleep,

18  socializing with his cheese-making friend, hiking with other friends, socializing with neighbor who

19  offered to drive plaintiff home after his minor surgery, making cookies with a special recipe found

20  online for a visit to a friend's house for the holidays, and plaintiff's reports that he goes out for

21  dinner and a movie with friends three to four times a month. AR 34. The ALJ also found that the

22  evidence of plaintiff's daily activities contradicted plaintiff's description of his "typical" inactive

23  and isolated day as one during which he was too depressed to do anything but eat and sleep. AR 34–

24  35. Moreover, the ALJ noted that plaintiff's alleged mood swings seemed to coincide with periods

25  of medical non-compliance, and that the first time plaintiff accepted a prescription for psychotropic

26  medications after his application was the date plaintiff filed for a Request for Hearing, leading the

27  ALJ to question whether the treatment sought from Dr. Harris was motivated by symptoms or the

28

1   need for medical evidence to support plaintiff's appeal of this claim. AR 34, 35. The ALJ further

2   highlighted that the other psychiatrists who evaluated plaintiff from spring of 2009 to August 2010

3   found only minor clinical signs, despite the total lack of any prescribed medication and despite

4   plaintiff's alleged longstanding major depression and bipolar disorder diagnosis. AR 34, 35.

5        At the last and final step, the ALJ held that in light of plaintiff's age, education, work

6   experience, and determined RFC, there are jobs that exist in significant numbers in the national

7   economy that plaintiff could perform. AR 36. The ALJ held that plaintiff's ability to perform work

8   at all exertional levels is compromised by non-exertional limitations, so she used a vocational expert

9   to determine to what extent these limitations limited available opportunities. AR 37. The ALJ asked

10   the vocational expert whether jobs exist in the national economy for an individual with plaintiff's

11   characteristics as to age, education, work experience, and previously determined RFC. AR 37. The

12   expert testified that such an individual would be able to perform unskilled occupations such as

13   janitor, with 25,000 jobs in the Santa Clara and Greater San Francisco Bay Area, agricultural

14   sorter/grader, with 1,500 jobs in the region, or assembler, lens-inserter, in combination with

15   production, with 44,200 such jobs in the regional economy. AR 37.

16        As a result of this five-step analysis, the ALJ found that plaintiff is not disabled under the

17   Social Security Act. AR 37.

## II.  ANALYSIS

### A.  Standard of Review

20        The court has jurisdiction to review the Commissioner's decision denying benefits pursuant

21   to 42 U.S.C. § 405(g). However, the district court's scope of review is limited. The Commissioner's

22   decision (here the decision of the ALJ) will be disturbed only if it is not supported by substantial

23   evidence or if it is based upon the application of improper legal standards. 42 U.S.C. § 405(g);

24   *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In this context, evidence is substantial if it

25   is "more than a mere scintilla but less than a preponderance; it is such relevant evidence that a

26   reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Charter*, 108 F.3d

27   978, 980 (9th Cir. 1997). To determine whether substantial evidence exists to support the ALJ's

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

decision, the court examines the administrative record as a whole and considers evidence both supporting and detracting from the Commissioner's conclusion. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). Where evidence exists to support more than one rational interpretation, the court must defer to the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Sandgathe*, 108 F.3d at 980. The court may not substitute its judgment for that of the commissioner. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). However, neither may the court "affirm simply by isolating a specific quantum of supporting evidence." *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "The court's review is limited to the reasons the ALJ provided in the disability determination." *Marovich v. Colvin*, No. 4:12-cv-06366-KAW, 2014 WL 900917, at *4 (N.D. Cal. 2014). Therefore, the court may not affirm using a basis upon which the ALJ did not rely. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). Finally, the court "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Where there are conflicting medical opinions, the ALJ must determine the credibility of the parties and resolve the conflict. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). "Greater weight must be given to the opinion of treating physicians, and in the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'" *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (quoting *Matney*, 981 F.2d at 1019). However, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When an ALJ rejects either a physician's opinion on disability or diagnosis, he "must do more than offer his conclusions," and "must set forth his own interpretations and explain why they, rather than the doctor's, are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

## B. The ALJ Properly Supported Her Decision With Substantial Evidence

Plaintiff contends that the ALJ failed to support her decision to deny plaintiff's benefits with substantial evidence. MSJ at 23. Specifically, plaintiff argues that the ALJ erred in her RFC assessment by failing to give proper weight to the opinion of Dr. Harris, failing to properly evaluate

the opinions of Dr. Weber and lay witnesses Ms. Savage and Ms. Patino, and rejecting plaintiff's testimony without making a proper credibility finding. MSJ at 9. Plaintiff also argues that the ALJ erred in failing to comply with SS 82-59 by not following the required steps in evaluating whether to deny benefits based on failure to follow prescribed treatment. MSJ at 18. Plaintiff's final argument is that the ALJ failed to ask the vocational expert a complete hypothetical, as plaintiff contends the ALJ did not include all limitations supported by the record. MSJ at 21. The court considers each argument in turn.

### 1.  The Weight Given To The Opinion of Dr. Harris Was Supported By Substantial Evidence

Plaintiff argues that the ALJ did not offer legitimate reasons based on substantial evidence for rejecting Dr. Harris's opinion. MSJ at 10. Plaintiff contends that the ALJ erred in choosing to give full weight only to Dr. Harris's findings, and not to her subjective opinions reflected in two questionnaires. Plaintiff also argues that Dr. Harris's subjective judgments regarding plaintiff's non-exertional limitations are consistent with the record as a whole. MSJ at 11. Plaintiff points to several of Dr. Harris's treatment notes in support of the proposition that Dr. Harris's observations cannot properly be characterized as "benign," as they were by the ALJ, and plaintiff contends that the ALJ completely ignored Dr. Harris's diagnosis of bipolar disorder type II even though such diagnosis was supported by the record. MSJ at 11. Lastly, plaintiff argues that disability claimants should not be punished for attempting to live normal lives, and that plaintiff's activities of daily living and social life are consistent with Dr. Harris's subjective opinions. MSJ at 11. According to plaintiff, the fact that Dr. Harris was aware of plaintiff's social activities renders her opinions more credible. MSJ at 12.

The ALJ properly rejected those of Dr. Harris's opinions that she found inconsistent with the rest of the record. The ALJ offered legitimate reasons based on substantial evidence for her rejection. While it is true that the opinion of a treating physician is given greater weight than that of a non-treating physician, *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *as amended* (Apr. 9, 1996), it is equally true that an ALJ need not give controlling weight to the opinion of a treating physician because such opinions are not binding on an ALJ with respect to the existence of an

impairment or the ultimate determination of disability. *Batson*, 359 F.3d at 1194-95. Moreover, an ALJ may discredit a treating physician's opinions that are conclusory, brief, or unsupported by the record as a whole or by objective medical findings. *Id.* at 1195.

Here, while the ALJ did not find Dr. Harris's opinions to be controlling, she still considered them in making her RFC determination. AR 35. The ALJ determined that Dr. Harris's finding of moderate limitations for detailed or complex tasks and moderate difficulty in sustaining attention and a normal work schedule supported a work limitation to simple, repetitive tasks of unskilled work. AR 35.

The ALJ discounted Dr. Harris's opinion from the August 2011 questionnaire because she found that Dr. Harris's own treatment notes and observations, which evidenced a benign mental status, contradicted the questionnaire. Such discrepancies are appropriate justification for an ALJ not to rely on a doctor's opinion. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Moreover, the ALJ found that plaintiff's documented activities of daily living were also inconsistent with the questionnaire, and did not support greater restrictions than those determined by the ALJ. AR 32. The ALJ relied on Dr. Harris's treatment reports, which indicated that plaintiff's objective mental status was generally normal and stable, with few deviations. AR 33. Going through plaintiff's treatment history from April 2010 to October 2012, the ALJ pointed to the many treatment notes which indicated that plaintiff was improving and was able to set and meet goals when interested or motivated. AR 27-29, 33. As the ALJ highlighted, the treatment notes show that plaintiff's trajectory was generally positive, and the instances of his irritability and mood swings became less frequent and appeared to coincide with periods of medical non-compliance or changes in medication. *See* AR 630–654.

Plaintiff argues that the record as a whole supports the conclusion that plaintiff "primarily" spends his days isolating in his apartment. MSJ at 12. The court disagrees. From the twenty-three treatment notes spanning over two and a half years, Dr. Harris reports plaintiff's mood as euthymic on fifteen occasions. Moreover, her notes mention "*occasional* irritability," AR 651, "walking *regularly*," AR 651, "*still* has mornings (maybe 1 day every 1-2 wks) when he experiences *little*

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    motivation," AR 646, "*very upbeat*" about new apartment, AR 645, "*enjoying* a quiet life in the

2    apartment," AR 644. These observations do not support the conclusion that plaintiff "primarily"

3    spends his days isolating. Dr. Harris's treatment notes over the plaintiff's entire treatment period

4    contain evidence that suggests just the opposite, including plaintiff's ability to make friends even

5    when feeling occasional irritability and when he isolates, AR 651, his ability to stand up for himself

6    and others appropriately, AR 649, his lack of worries that he would relapse, AR 648, his confidence

7    in his computer skills and aspirations to improve, AR 647, and his steady weight loss of almost fifty

8    pounds over the course of the two and a half years by setting successive weight goals and reaching

9    them one by one, AR 652, 644, 640, 638, 634, 631. Dr. Harris does not refer to this evidence in her

10   questionnaires, instead basing her opinion only on the two reports of bland mood in May 2010 and

11   increased irritability and mood swings in July 2011. AR 590.  Dr. Harris characterizes plaintiff's

12   weight loss as appetite disturbance based on the July 2011 report of eleven pounds lost in four

13   months, even though in her treatment notes she stated that plaintiff had set a goal to lose weight

14   because he was overweight, and had slowly reached his goal and a healthy weight by April 2012.

15   AR 591. Dr. Harris rates plaintiff's difficulties in maintaining concentration, persistence, or pace as

16   moderate because of his tendency to not pursue his plans, giving as example the fact that plaintiff

17   talked about taking computer classes for one year without doing so. AR 597. But Dr. Harris does not

18   appear to credit plaintiff's setting and meeting progressive weight loss goals until reaching a healthy

19   weight, that he started studying books to prepare himself to return to school for the computer

20   classes, that he was able to successfully complete the probation and court ordered program and 140

21   hours of community service, or, most notably, that plaintiff was able to stay sober for more than two

22   years, despite his long history of addiction. Accordingly, because the evidence found in Dr. Harris's

23   treatment notes contradicts the opinions she expressed in the questionnaires, the ALJ did not err in

24   rejecting Dr. Harris's opinions to the extent they were inconsistent with her treatment notes and

25   claimed findings. Such a conclusion is supported by substantial evidence.

26          Additionally, other doctors' evaluations and opinions contradict Dr. Harris's questionnaire

27   answers and support the ALJ's RFC determination. For example, in February 2010 Dr. Weber

28

observed that plaintiff was stable, and his mood "o.k. for the most part," as was his sleep. AR 516.
His appetite is reported as normal and his energy as average. AR 516. In August 2009, Dr. Acenas
diagnosed plaintiff with only polysubstance dependence in recent remission, and determined that
plaintiff's mood was *mildly* depressed, with appropriate affect, that his speech was spontaneous, and
that he was friendly and cooperative. AR 396.

     The ALJ also properly rejected Dr. Harris's follow-up questionnaire from October 2012. The
ALJ found this questionnaire to be a conclusory and non-durational medical opinion, which did not
include an onset date and did not represent limitations ongoing for twelve continuous months, as
required by the Social Security Act. *See* 42 U.S.C. § 423(d)(1)(A). Plaintiff argues that the fact that
the questionnaire lacks a date is ambiguous because it could mean either that Dr. Harris was
clarifying her responses to the earlier questionnaire or that she wanted to add new limitations as of
the date of the second questionnaire, and this ambiguity triggers the ALJ's duty to clarify it. MSJ
13-14. However, this argument is moot, because even if there was an ambiguity as to the date, the
ALJ stated other reasons for rejecting the questionnaire and these reasons are supported by
substantial evidence. The ALJ stated that the "major reason" why she rejected the 2012
questionnaire was that it was inconsistent with the ongoing treatment notes which "invariably"
reported normal mental status evaluations, good sleep and stable mood, especially when medically
compliant. AR 33. As discussed above, this determination is supported by substantial evidence.

     Plaintiff's argument that the ALJ completely ignored Dr. Harris's diagnosis of bipolar
disorder type II is similarly without merit. Where there are conflicting medical opinions, the ALJ
must determine the credibility of the parties and resolve the conflict. *Matney*, 981 F.2d at 1019. If
the evidence reasonably supports either position, the court may not substitute its judgment for that
of the ALJ. *Batson*, 359 F.3d at 1196. Here, the ALJ supported her finding of mood disorder NOS
and history of polysubstance abuse as severe impairments by pointing to the numerous times
plaintiff was diagnosed as such. AR 26-27; *see also* AR 474 (March 19, 2009, mood disorder NOS
and polysubstance abuse, GAF 65); AR 476 (April 14, 2009, mood disorder resolved); AR 487, 568,
581 (MFT Hsiang, October 6, 2009 and November 20, 2009, mood disorder NOS); AR 534 (Dr.

United States District Court
For the Northern District of California

1   Weber, December 14, 2009 mood disorder NOS, and polysubstance dependence in remission, GAF

2   45); AR 508-09 (February 22, 2010 mood disorder NOS, GAF 57); AR 486 (MFT Hsiang, August

3   31, 2010 discharge diagnoses mood disorder NOS, GAF 67). She also pointed out the fact that even

4   though plaintiff was diagnosed with bipolar disorder II by Dr. Aguilera in 1996 and 2004, and

5   received disability SSI payments, plaintiff received no mental health treatment and no psychotropic

6   medications— other than one week while in jail in March 2009—until he started seeing Dr. Harris

7   in April 2010. In any event, contrary to plaintiff's claims, the ALJ looked at Dr. Harris's treatment

8   notes, which consistently reported that plaintiff was stable while on medication, manifesting

9   coherent and rational thoughts, mostly with euthymic mood, and bright or appropriate affect,

10  especially when compliant with medication, but also on some occasions when he was not on

11  medication and dealing with difficult living situations. AR 27-30.

12      In sum, the ALJ properly considered, and rejected with substantial evidence, parts of Dr.

13  Harris's medical opinions to the extent they were inconsistent with the rest of the record. While

14  there may also be support in the record for a contrary conclusion, the court is not empowered to

15  substitute its judgment for that of the ALJ. *Batson*, 359 F.3d at 1196.

16      **2.  The ALJ Did Not Reject Dr. Weber's Opinion And Properly Assessed Her Notes**

17      Plaintiff argues that the three occasions on which Dr. Weber met with plaintiff as part of his

18  court ordered treatment established an "ongoing treatment relationship" and that the ALJ erred in

19  not giving Dr. Weber's opinion the weight of a treating physician. Plaintiff argues that

20  consequently, by ignoring her treatment records, referring to her as "evaluating psychiatrist" and

21  failing to address Dr. Weber's bipolar II disorder diagnosis, the ALJ erred. MSJ at 14–15.

22      As an initial matter, the court notes that the ALJ did not ignore Dr. Weber's notes. On the

23  contrary, the ALJ specifically referred to the progress notes both in determining plaintiff's

24  impairments and in making the RFC determination. *See* AR 27, 34. Nor did Dr. Weber give an

25  opinion as to plaintiff's functional abilities or limitations. And contrary to plaintiff's arguments, the

26  ALJ did not ignore Dr. Weber's treatment records: the ALJ expressly used Dr. Weber's notes to

27  support her finding that plaintiff had mood disorder NOS as a severe impairment. AR 26-27. She

28

United States District Court
For the Northern District of California

1    noted that Dr. Weber initially diagnosed plaintiff with mood disorder NOS and said that the

2    diagnosis was unclear because plaintiff was not able to provide enough information and did not at

3    that point meet "bipolar criteria." AR 27, 533. Even though Dr. Weber later diagnosed plaintiff with

4    bipolar II disorder, as already explained above, the ALJ finding that plaintiff's impairment was

5    mood disorder NOS and not bipolar disorder type II was supported by substantial evidence. The

6    ALJ also took into consideration and found important the fact that Dr. Weber never prescribed

7    plaintiff any medication despite her diagnosis, and found him stable even without medication. AR

8    34. The ALJ used this information from Dr. Weber's notes to justify her partial rejection of Dr.

9    Harris's opinion. AR 34.

10        Plaintiff also argues that Dr. Weber's notes, which state that plaintiff was "somewhat

11    dysphoric" and assign him a GAF score of 45, support Dr. Harris's opinion. MSJ at 15. According

12    to plaintiff, Dr. Weber's notes indicate serious impairments in social and occupational functioning.

13    However, Dr. Weber's notes also mention that plaintiff's mood and sleep were "'o.k. for the most

14    part,'" and that his appetite was "normal," his energy was "average," his mood was euthymic, and

15    that he had logical and goal oriented thought process, despite not taking medication. AR 516. Such

16    evidence is consistent with the majority of the evidence in Dr. Harris's notes, and, contrary to

17    plaintiff's position, supports the ALJ's rejection of Dr. Harris's questionnaire opinion.

18        Although the ALJ may have reached a different impairment determination than Dr. Weber,

19    Dr. Weber did not offer an opinion, and the ALJ did not ignore Dr. Weber's notes: she gave them

20    proper weight and used them in support of her RFC determination.

### 3.  The ALJ's Negative Credibility Finding As To Plaintiff Was Supported By Substantial Evidence In The Record

22        Plaintiff argues that the ALJ erred in rejecting plaintiff's testimony without making a proper

23    credibility finding and without providing clear and convincing reasons for the rejection. MSJ at 15–

24    16. Plaintiff claims that because the nature of his disability means he has good days and bad days,

25    his level of activity is not inconsistent with his claimed limitations, and therefore has no bearing on

26    his credibility. MSJ at 17. Plaintiff also asserts that the ALJ mischaracterized his testimony when

1    she found that his serving as a trustee during his incarceration was indicative of his interpersonal

2    skills. MSJ at 17.

3    It is uncontroverted that the ALJ is responsible for determining credibility. *Andrews v.*

4    *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). A negative credibility finding by the ALJ "must be

5    supported by a specific, cogent reason for the disbelief." *Rashad v. Sullivan*, 903 F.2d 1229, 1231

6    (9th Cir. 1990). "General findings are insufficient; rather, the ALJ must identify what testimony is

7    not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834.

8    To assess credibility, an ALJ may consider a range of factors, including: "(1) ordinary

9    techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent

10   statements concerning the symptoms, and other testimony by the claimant that appears less than

11   candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed

12   course of treatment; and (3) the claimant's daily activities." *Smolen v. Chater*, 80 F.3d 1273, 1284

13   (9th Cir. 1996). But the ALJ should not hold a plaintiff's attempts at leading a normal life against

14   him. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); s*ee also Cooper v. Bowen*, 815 F.2d 557,

15   561 (9th Cir. 1987) (noting that a disability plaintiff need not "vegetate in a dark room" in order to

16   be eligible for benefits). Evidence of daily activities bears on credibility only if the level of activity

17   is inconsistent with a claimant's claimed limitations. *Reddick*, 157 F.3d at 722.

18   Here, the ALJ properly supported her adverse credibility determination with specific, cogent

19   reasons rooted in the evidentiary record. Although plaintiff is correct that the ALJ concludes

20   generally that plaintiff's statements regarding the intensity, persistence, and limiting effects of his

21   symptoms are not credible "for the reasons explained in this decision," AR 36, this conclusion

22   follows several paragraphs in which the ALJ specifically identifies the testimony by plaintiff that

23   she found not credible, and the evidence she found undermined plaintiff's testimony. Although the

24   ALJ's determination may not be a model of clarity, the ALJ ultimately relied upon two different

25   grounds for her adverse credibility finding, both of which are supported by substantial evidence.

26   The ALJ chiefly based her adverse credibility finding on the inconsistency between

27   plaintiff's testimony and the evidence of his daily activities. *See Smolen*, 80 F.3d at 1284. The ALJ

28

1   found that plaintiff's claimed extreme depression resulting in severe isolation was inconsistent with

2   his daily activities throughout the disability period. This finding is supported by substantial evidence

3   in the record. Plaintiff testified at the hearing that he would get highly irritated at people and things,

4   and have depressive episodes that occurred once or twice a month and lasted anywhere from one

5   day to one week. Plaintiff testified that during these episodes he did not leave the house at all, unless

6   absolutely necessary. AR 151. According to plaintiff, a typical depressive day consists of him

7   waking up only long enough to eat, use the restroom, and go back to bed, too depressed to do

8   anything else. AR 34, 151–155. The ALJ contrasted this testimony with evidence in the record

9   showing that plaintiff has no problem driving, shopping, walking places or taking public transit,

10  inviting a friend to his apartment to make cheese which they would sell at a local farmer's market,

11  going hiking with friends, developing a relationship with a neighbor who ended up giving him a ride

12  home from minor surgery, making special cookie recipes when visiting a friend, and meeting friends

13  for dinner and sometimes a movie 3 or 4 times a month. AR 34. Plaintiff also testified that although

14  he sometimes forgot to eat during these episodes, he would usually eat more. AR 152. Yet as the

15  ALJ noted, plaintiff was successfully losing weight over this period, and "reported feeling more

16  energy and capacity for being more active because of his weight loss." AR 34. The ALJ further

17  noted plaintiff's pride at losing considerable weight, until he reached a "healthy BMI" according to

18  Dr. Harris. *Id.* The ALJ's conclusion that "the record contradicts the claimant's description of his

19  'typical' inactive and isolated day" is therefore supported by substantial evidence in the record and

20  supports an adverse credibility finding. *See Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014)

21  ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can

22  support an adverse credibility determination."); *see also Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir.

23  2007); *Batson*, 359 F.3d at 1196.

24         The ALJ also supported his adverse credibility finding by noting that for a significant part of

25  his claimed period of disability, and despite his alleged depression and isolation, plaintiff "was not

26  seeing a psychiatrist or taking any psychotropic medications." AR 34. In assessing a claimant's

27  credibility, an ALJ may properly rely on "'unexplained or inadequately explained failure to seek

United States District Court
For the Northern District of California

treatment or to follow a prescribed course of treatment.'" *Tommasetti v. Astrue*, 533 F.3d 1035,

1039 (9th Cir. 2008) (quoting *Smolen*, 80 F.3d at 1284); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.

1989). According to agency rules, "the individual's statements may be less credible if the level or

frequency of treatment is inconsistent with the level of complaints." SSR 96-7, at 5. Moreover, a

claimant's failure to assert a good reason for not seeking treatment, "or a finding by the ALJ that the

proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony."

*Fair*, 885 F.2d at 603; *see also Molina*, 674 F.3d at 1113–14.

Here, the record indicates that plaintiff went long periods without seeking treatment, and

took no psychotropic medications until after he filed a Request for Hearing. AR 34, 395–96, 516,

547–48. Plaintiff saw Dr. Weber three times between December 14, 2009 and February 1, 2010, and

on all three visits plaintiff asked Dr. Weber to hold off on prescribing any medication telling her that

he was likely to transfer to a different mental health program. *Id*. The record also contains evidence

of many instances of medical noncompliance with medication prescribed by Dr. Harris and failure

to comply with Dr. Harris's directives to have his labs drawn. Although some of the instances of

non-compliance may have been due to factors outside of plaintiff's control (i.e., insurance

problems), many of them were due to his own choice or preference. *See* AR 635, 636, 637, 640.

Moreover, the ALJ observed that plaintiff's alleged mood swings, as documented by Dr. Harris,

seemed to coincide with periods of medical non-compliance, and that between the spring of 2009

and August 2010, when he was not taking any medications, the psychiatrists who evaluated plaintiff

found only minor clinical signs of disability. Thus, while the ALJ did not make an explicit finding

that plaintiff had failed to assert a good reason for seeking treatment, the ALJ did find that his

frequency of treatment was inconsistent with the level of his complaints. *See* AR 35 ("Whether the

treatment . . . was motivated by his symptoms or a need for medical evidence to support appeal of

this claim, the treatment notes of Dr. Harris generally documented benign clinical findings despite

significant breaks of non-compliance with prescribed medications or labs."). Under Ninth Circuit

law, this is a proper basis for an adverse credibility determination. *See Molina*, 674 F.3d at 1113-14;

*Lockwood v. Comm'r Soc. Sec. Admin.*, 397 F. App'x 288, 290 (9th Cir. 2010) (ALJ's reasons for

United States District Court
For the Northern District of California

1    finding claimant not credible were sufficient and were supported by substantial evidence where the

2    ALJ explained that plaintiff's active lifestyle was not consistent with her claims of debilitating pain,

3    depression, and an inability to sit, stand, or walk for more than brief periods.)

4         Accordingly, the court finds that because the ALJ's adverse credibility determination was

5    supported by substantial evidence in the record, the ALJ's rejection of plaintiff's testimony was not

6    error.

7         **4.  Substantial Evidence Supports The ALJ's Rejection Of The Lay Witness Opinions**

8         Plaintiff argues that the ALJ erred in rejecting the opinions of Ms. Patino and Ms. Savage,

9    and contends that these lay opinions are consistent with the opinions of Dr. Harris and Dr. Weber,

10   and with the record as a whole. MSJ at 18.

11        Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's

12   ability to work is competent evidence that an ALJ must take into account, and competent lay

13   witness testimony "cannot be disregarded without comment." *Nguyen v. Chater,* 100 F.3d 1462,

14   1467 (9th Cir.1996). In order to discount competent lay witness testimony, the ALJ "must give

15   reasons that are germane to each witness," but the ALJ need not discuss every witness's testimony

16   on an individualized, witness-by-witness basis. *Molina,* 674 F.3d at 1114. Rather, if the ALJ gives

17   germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons

18   when rejecting similar testimony by a different witness. *Id.*

19        Here, the ALJ properly evaluated reports by plaintiff's case managers Ms. Savage and Ms.

20   Patino, and supported her decision to dismiss this lay testimony. The ALJ explained that Ms. Savage

21   and Ms. Patino submitted letters suggesting poor "social functioning levels," but these letters

22   "appear[ed] to be essentially just repeating the claimant's subjective complaints that he is very depressed

23   and isolates himself." AR 34. Since the ALJ already provided clear and convincing reasons for rejecting

24   similar testimony by plaintiff and opinion by Dr. Harris, she did not have to identify those reasons again

25   to reject Ms. Savage and Ms. Patino's opinion letters. *See Valentine v. Astrue,* 574 F.3d 685, 694 (9th

26   Cir. 2009) (holding that because "the ALJ provided clear and convincing reasons for rejecting [the

27   claimant's] own subjective complaints, and because [the lay witness's] testimony was similar to such

28

1    complaints, it follows that the ALJ also gave germane reasons for rejecting [the lay witness's]

2    testimony").

3         As the ALJ rejected this lay testimony for the same reasons she rejected plaintiff's testimony and

4    two of Dr. Harris's questionnaire responses, she did set forth several reasons for doing so. The ALJ

5    noted that Ms. Savage and Ms. Patino's letters were inconsistent with Dr. Harris's treatment notes. AR

6    34. The ALJ also highlighted some of the evidence of plaintiff's daily activities in the record that

7    contradicts Ms. Savage and Ms. Patino's reports. For example, the ALJ found Ms. Savage and Ms.

8    Patino's opinions inconsistent with Dr. Harris's treatment notes, in that the notes repeatedly and

9    regularly described good sleep and social activity, while Ms. Savage and Ms. Patino's letters painted a

10   picture of extreme depression and severe isolation. Plaintiff contends that Ms. Savage and Ms. Patino's

11   letters are not necessarily inconsistent with the ALJ's conclusions, as plaintiff might have good and bad

12   days. However, the ALJ found it hard to square the conclusions of Ms. Savage and Ms. Patino that

13   plaintiff is "incredibly secluded and isolates most days for the entire day" with the evidence in the

14   record. AR 368. Ultimately, the ALJ identified reasons for rejecting this lay testimony that was germane

15   to each witness. The court therefore finds that her rejection of Ms. Savage and Ms. Patino's letters was

16   not error.

17   **C. The ALJ Was Not Required To Apply SSR 82-59**

18        Plaintiff argues that the ALJ erred in not following the steps required by Social Security

19   Ruling 82-59 ("SSR 82-59") in order to make a finding regarding failure to follow prescribed

20   treatment. MSJ at 18. Plaintiff further argues that the ALJ erred when she used plaintiff's alleged

21   noncompliance in her evaluation of plaintiff's credibility and her rejection of Dr. Harris's opinion.

22   *Id*.

23        SSR 82-59 states the policy and describes the criteria necessary for a finding of failure to

24   follow prescribed treatment when evaluating disability under titles II and XVI of the Social Security

25   Act. However, the procedures mandated by SSR 82-59 only apply to claimants who would

26   otherwise be disabled within the meaning of the Act. *Roberts v. Shalala*, 66 F.3d 179, 183 (9th Cir.

27   1995), as amended (Oct. 23, 1995). Where a claimant would not otherwise be disabled because he

28

United States District Court
For the Northern District of California

1    or she failed to meet one of the requirements set up in the five steps of 20 C.F.R. § 416.920(a), and

2    where the Secretary does not premise the denial of benefits solely on a claimant's failure to follow

3    prescribed treatment, the protections of SSR 82-59 do not apply. *Id.* SSR 82-59 does not restrict the

4    use of evidence of noncompliance; rather, SSR 82-59 it merely delineates the reasons that the SSA

5    may deny benefits to an otherwise disabled person because they fail to comply with their doctor's

6    prescribed treatment. *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001).

7         Here, the ALJ never determined that plaintiff was disabled and that compliance with

8    prescribed treatment would restore his ability to work. On the contrary, the ALJ determined that

9    plaintiff was not disabled as of the alleged onset date because his impairments did not meet the

10   severity required by the Social Security Act, and found that plaintiff had the RFC to perform a full

11   range of work for which there are jobs that exist in significant numbers in the national economy.

12   The ALJ did not use medical noncompliance as an independent basis for denial of benefits.

13   Accordingly, because the ALJ concluded that plaintiff was not disabled, SSR 82-59 is not

14   controlling.

15        To the extent that the ALJ implicitly considered plaintiff's failure to seek treatment and to

16   comply with prescribed medication and lab requests in weighing the credibility of plaintiff's

17   subjective claims of limitations, the ALJ did not err. As discussed above, an ALJ may properly rely

18   on "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course

19   of treatment" in assessing a claimant's credibility. *Molina*, 674 F.3d at 1113; *Tommasetti*, 533 F.3d

20   at 1039. According to agency rules, "the individual's statements may be less credible if the level or

21   frequency of treatment is inconsistent with the level of complaints, or if the medical reports or

22   records show that the individual is not following the treatment as prescribed and there are no good

23   reasons for this failure." SSR 96-7p.

24        Accordingly, the court finds that the ALJ did not err when she did not follow the steps

25   required in SSR 82-59 or when she used plaintiff's alleged noncompliance in weighing plaintiff's

26   credibility.

27

28

## D.  The ALJ Properly Relied On The Vocational Expert's Testimony In Response To Her Hypotheticals

Plaintiff's final argument is that the ALJ erred in failing to ask the vocational expert a complete hypothetical, because she did not include all the limitations supported by the record. MSJ at 21.

As discussed above, the ALJ's RFC determination was supported by substantial evidence in the record. It therefore follows that the ALJ's hypotheticals, which included the limitations from her RFC determination, were proper. The ALJ was not required to rely on responses from the vocational expert to hypotheticals that included other limitations. *See Rollins v. Massanari,* 261 F.3d 853, 858 (9th Cir.2001) ("Because the ALJ included all of the limitations that he found to exist, and because his findings were supported by substantial evidence, the ALJ did not err in omitting the other limitations that [the plaintiff] had claimed, but had failed to prove.").

The vocational expert testified that a person with plaintiff's RFC as determined by the ALJ would be able to perform unskilled occupations such as janitor, with 25,000 jobs in the Santa Clara and Greater San Francisco Bay Area, agricultural sorter/grader, with 1,500 jobs in the region, or assembler, lens-inserter, in combination with production, with 44,200 such jobs in the regional economy. The ALJ was entitled to rely on the vocational expert's testimony in response to her hypotheticals. *See Bayliss,* 427 F.3d at 1217-18.

### III.  ORDER

For the reasons explained above, the court DENIES plaintiff's motion for summary judgment and GRANTS defendant's cross-motion for summary judgment.

Dated: March 31, 2015

_Ronald M. Whyte_
Ronald M. Whyte
United States District Judge

United States District Court
For the Northern District of California